17-84 May it please the Court, Brett Apieri on behalf of the U.S. Department of Justice on behalf of Carol Manning. The government is asking this Court for a new rule today, a rule regarding the significance of the relationship between a defendant and the declarant of a statement against penal interest. This Court before has indicated that such a relationship warrants scrutiny, but the government is now asking this Court to rule, to affirm a district court who relied on nothing else. Moreover, this case would be a poor vehicle for making such a determination, because while there was potentially, depending on the ambiguities of the Court's ruling, an aspect of her ruling that depended on the relationship between the declarant and the defendant, there was also corroborating evidence of the statement on the other side. To begin with, there was a relationship between the declarant and the witness, which other courts have recognized to be a corroborating circumstance. This was not a statement that a declarant made in an express attempt to get his father off of this charge. This was a statement made repeatedly over the course of 63 conversations he had during a four-month period with his aunt while the declarant was incarcerated in various Wyoming institutions. So there's that evidence to corroborate this statement. And there was other evidence surrounding this statement that tended to corroborate it as well. To begin with, there was evidence suggesting that the police suspected Mr. Gallegos, the declarant, in connection with the burglary that netted the gun that was found in the first place. Recall that in the second interview Mr. Manning gave to police, detectives steadily approached Mr. Manning at his bail bondsman, and what he was looking for was contact information for Mr. Gallegos in connection with both burglaries, the first of which had had been the first of which the gun had been stolen. So this evidence tended also to corroborate Mr. Gallegos' statement that he was the one responsible for the gun. There was also the fact that there's nothing in this record to suggest that Mr. Manning was ever charged in either burglary. Indeed, there's evidence that rather tends to suggest he was not charged in either burglary. Finally, there was nothing from the second burglary, the second purported burglary at Mr. Strand's house that was ever found on Mr. Manning. So the government's apparent theory in this case that Mr. Manning was caught up in both burglaries has some significant holes in that Mr. Strand followed Mr. Manning as he left Mr. Manning's house for a long time. The police were there within minutes, and within minutes, Officer Cook was retracing Mr. Manning's footsteps. Nothing from Mr. Strand's house was ever found. They found the backpack and the hat very quickly. Nothing found from the Strand robbery, burglary. So all of these things together tend to corroborate the statement that Mr. Gallegos made. So despite all of this, the district court, without reviewing any of that evidence, ruled that simply, apparently, based on the relationship. What was the proffer of the statement that Gallegos made? The proffer of the statement was that he has admitted on multiple occasions that the firearm was not his father's, his father didn't know about it, and that as soon as he could, he asserted, and on a number of occasions, that if he was ever arrested, his father, that is, he'd come forward. That was the proffer about the multiple statements that he made. Well, I guess, sort of, I want you to back up, then. The proffer itself didn't suggest that Manning, or that Gallegos would say that the firearm was his. The proffer was, he was going to say it wasn't dad's, right? And how does that meet the first part of 804-B3? The proffer could have been more clear, it is true. However, in context, it doesn't make sense, given that the ---- Well, the proffer is the proffer. The proffer is the proffer, but the context is also the context. And the context was that counsel was appointed to Mr. Gallegos, and counsel said, we're taking the fifth, because Mr. Gallegos stands in exactly the same position as Mr. Manning. He's a felon, too. Well, this is a trial for a felon in possession of a firearm. So it doesn't make any sense to make that statement, that he's in the same spot, if the statements weren't going to be, I had the gun. And this is not ---- But remember the burden here. Your client had to show it was clearly trustworthy, had to present corroborating evidence showing it was clearly trustworthy. So if there's ambiguity, if there's not much there, we don't draw inferences in favor of trustworthiness. We have to have a proof of trustworthiness, clear evidence. I'm sorry, Judge Hartz. Is your question that the things that I recited, the corroborating the relationship with the aunt, that those were not sufficient corroborating evidence, or that somehow the proffer itself was inadequate? Well, to the extent it's inadequate, it makes it harder for the judge to make a common sense determination. These aren't rigid rules. This is a common sense issue of whether there are facts showing this is clearly trustworthy. And I would suggest ---- My point was merely that you seem to be putting the burden on the government to show it wasn't trustworthy. But go ahead. I don't want to get ---- No, no, no. I think in light of the fact that there were corroborating circumstances, the fact of the aunt, the fact that there was evidence before the court and before the jury that steadily was looking for Gallegos in connection with this crime, that those are all indicia of the reliability of the statement. The district court didn't review any of that, which is another problem with the district court's ruling. All the district court said was, based on these relationships, this is insufficiently corroborated. The district court also didn't find there was a problem with the proffer. All the district court said, I can read the ruling. Based upon the close relationship of this witness as well as the relationship of Gallegos, I find a lack of corroborating evidence to support the veracity of the hearsay that sought to be admitted. So that's it for the district court's ruling. It's not a problem with the proffer and it's not a problem with all of this other corroborating evidence. And the district court doesn't rehearse that at all. It's just these two relationships and at least one and possibly both of the ones she cites, because the ruling is somewhat ambiguous, are expressly wrong. The relationship of this witness should not ever have been a consideration in excluding the statement, because if it's the relationship of the witness to the defendant, then it's simply black letter law that witness credibility is a matter for the jury. If it's the relationship of the witness to the declarant, we have the letter, the law, that it's a matter for the jury. And then we also have the fact that many courts have recognized that a close relationship actually corroborates a relationship, the reliability of the statement. And then in addition, we have the fact that the government relied solely on Lozado. And Lozado doesn't say this is enough. Just a relationship between a defendant and a declarant is enough. In Lozado, there were quite a few other circumstances which we don't have here. In Lozado, there was a long time between the statement against penal interest, almost eight months. Here, the statement started in October of 2016, so only three months. And there were 63 conversations and the proffer was multiple times he said this. It also wasn't a statement to law enforcement. It was a statement to a trusted ---- You repeated it a couple times, 63 times. Yes. Is that in the proffer? That is in Ms. Dietz's testimony to the court. It's at page 516 of the record, and there was no objection from the government. She said, between October of 2016 and January of 2017, I had 63 conversations with my nephew. And then the proffer was on multiple occasions. He says multiple twice. Mr. Gallegos made these statements. The Lozado case you just mentioned, I think Lozado, is that it? Lozado. You're lying on it. Isn't that ---- in that case, the declarant actually agreed, though, to speak with police, and the court found that significant, didn't it, in determining this wasn't necessarily a statement against his own interests, penal interest. He was willing to talk to the police. But here, Mr. Gallegos avoided talking to the prosecution and defense counsel. So, I mean, we don't have that significant factor here that the court had in Lozado's. But the court in Lozado found that it was ---- that the proffer was inadequate. And I ---- No, you were just comparing it, so I was ---- Sorry. You were comparing the cases, and it seemed to me that that was a significant distinction. I think that the significant distinctions in Lozado are both the time period and the radical inconsistencies, internal inconsistencies of the statement in Lozado, that the declarant didn't really know what the problem was. He didn't know anything about the ammunition. He got almost everything wrong, what type it was, what it looked like. He, in fact, was describing the ammunition that was actually found in his clothing in the apartment that wasn't charged to Mr. Lozado. And here we have quite the opposite. We have a close correspondence between what Mr. Gallegos understood to be the problem and what the problem actually was. There was ---- there were quite a few things in that backpack that could have gotten Mr. Manning into trouble. For instance, the drugs. A closer analog to be to Lozado would have been, I think, if Mr. Manning had said to the police, the drugs are mine, I didn't know about the gun. And then Mr. Gallegos had said, the drugs were mine. And no, Mr. Gallegos, all that stuff in the backpack is very consistent about the fact that the gun was his. He doesn't mention anything else in this proffer. So that's actually a consistency that differentiates this case from Lozado. And also in Lozado, there was even a question about whether the declarant had access to the car where all the stuff was found that he was claiming to have put there. Here again, we have detectives steadily looking for Mr. Gallegos in connection to the earlier robbery that netted a gun or burglary that netted a gun. So again, there's evidence in the record to support that Mr. Gallegos had access to this gun. If there are no further questions on that point, I will move on briefly to the question of harmlessness. Because of the quantum inequality and the significance of the evidence in this case, I think it would be an incorrect result for this Court on a cold record to affirm on the basis of harmlessness. There was significant, a significant number of conversations. As I've mentioned, there were 63 conversations in which multiple admissions were made. This was not a one-off. This was not somebody getting called in in front of the police and feeling pressured and admitting it a single time. This was someone talking to a trusted relative over and over and over again and making these admissions repeatedly. The quality of the evidence is also a significant factor. Again, he was speaking to a trusted aunt. I assume 63 conversations in four months is indicative of a fair degree of closeness. And these conversations were pre-indictment. This was not him trying to get his dad out of trouble once it was clear his dad was in trouble. All of these conversations were well before Mr. Manning was indicted. And the central core of this story is consistent. The government has made much of the inconsistencies in Mr. Manning's story, but the central core, every version of the story Mr. Manning told, Mr. Gallegos was there and Mr. Manning didn't know about the gun. And then the significance of this witness, of this evidence that was excluded, was considerable. This went to the heart of Mr. Manning's defense, especially when coupled about the evidence that he thought he would get life in prison that was also excluded. The hotly contested central issue in this case was Mr. Manning's knowledge of whether the gun was in the backpack or not. These two pieces of evidence that were excluded went directly to his state of mind and to his knowledge and were the only evidence he had available to contrast the government's story of, you know, well, it just follows naturally. The gun was in the backpack. He must have known it was there. If there are no further questions at this time, I'd like to reserve the remainder of my time for rebuttal. Thank you. May it please the Court, Counsel. I am Stephanie Hambrick and I'm here on behalf of the United States. I'm from the U.S. Attorney's Office in Casper. And I think it's interesting when we read the appellant's brief and listen to their arguments, I think it's important that we really look at the facts of this case and particularly some of the facts they left out of their brief as well as oral argument here today. And those facts surround the backpack and the firearm and the evidence that the Court heard regarding those items prior to the rulings that are in question here today. When we look at the backpack, I think it's important to remember the evidence was that the defendant, Mr. Manning, was found in possession of the backpack. So we start with that right there. He had that backpack and he had it for a considerable amount of time. During the time he had possession of this backpack, he made it clear he did not want to be caught with the backpack. We have testimony that originally he was trying to kind of hide it in the neighbor's bed of their truck, and when the neighbor saw him doing that, he took it out, ran with it, tried to hide it, did a lot to distance himself from this backpack. Then they also make a point that when the police officers found the hidden backpack, they opened it up, the gun was laying on top. So that clearly corroborates Mr. Manning's statement that he had given the backpack away and somebody had then put that gun on top of everything else in the backpack. Which sounds good. I'll admit it. But we have to look at the backpack. The evidence about the backpack and its contents are that it and other items inside of it, other than the firearm, were stolen from a home a few days prior to this home invasion. Mr. Marshall testified that he had kept the firearm and a baggie of bullets and the backpack were all kept in his closet. When he got home from vacation, all of those items were missing as well as some other items from their home. So we go to the day of this home invasion. Mr. Manning admits on multiple occasions he gave that backpack to Mr. Gallegos with the tools that were inside of it. And the reason why it changed over time to fix a car or fix a motorcycle or whatever, he admits he gave that backpack and everything but the gun in it to Mr. Gallegos. Other items found in the backpack were the baggie of bullets from that burglary as well as credit cards, passports, other items taken from that home. So it wasn't like I just loaned out a backpack, somebody stuffed a gun in it. It was the stolen backpack and there were other items in there, other than what Mr. Manning had given, that were also stolen from that home. So clearly that backpack had been intact from the first home invasion to this one where we find Mr. Manning with it. And he admits he gave him that backpack. So all of those items were in there together. It makes much less sense I loaned a backpack stolen a week earlier and somebody else just happens to put in a gun and other stolen items from that same burglary in the same backpack and a random package of credit cards from that home. It doesn't make any sense. So it's not this wonderfully consistent story. What the judge heard was a set of facts that makes Mr. Manning's multiple versions of events that don't make sense. That's what the judge had been hearing. So to say the evidence they want admitted would corroborate this wonderful consistent statement of Mr. Manning just doesn't jive and it doesn't jive with what the court heard that morning. I think the other important factors to look at, they want to gloss over the inconsistencies in the defendant's statements and say, well, they were minor and they don't matter, but he was always consistent that he didn't have a gun. Well, I mean, that's not a surprise. For a long time, he was very consistent that he never wore a hat. Well, we found the hat, we found DNA on the hat, so he finally said, okay, yeah, I had a hat. But even that version changed multiple times. I did have a hat and it fell off while I was jumping fences. No, I never had a hat. Okay, I did have a hat. Then he said, I never had the backpack. And then finally he realized that story wasn't going to work either. Okay, yeah, it was my backpack. And so, but we're supposed to believe when he says, but it wasn't my gun. Oh, well, he must be telling the truth about the thing that does the most damage to him when he would lie about everything else in that backpack. So it's not some wonderfully consistent statement that this evidence would have shined a light on to prove it to be true. It already didn't make any sense. And so for the court to not consider or allow in that evidence, if it was error, which I am not conceding, would have been harmless given all the other surrounding factors. When you look at this idea of the corroborating circumstances, and as the court indicated, it's the proponent's burden to show that those were clearly corroborated. And appellate counsel did a good job this morning of laying out for the court several circumstances that they felt were corroborating circumstances. However, those were not presented to the court during our argument as corroborating circumstances. They just weren't put forward. The witness did testify there were 63 conversations between her and her nephew. How many of those contained a conversation about the firearm? We have no idea. Does multiple, is multiple more than one? Is it two? Is it 20, 40, 60? We have no idea. And we have no idea, there's nothing to indicate there was anything in those statements that corroborated his knowledge of the firearm. All we know is he said, that wasn't my dad's firearm. He didn't know about it. There could be a lot of corroborating circumstances. In no case has a court ever found that a declarant's assertion of their Fifth Amendment privilege is a corroborating circumstance in and of itself. And the cases are replete with this exact circumstance, where there's a declarant and they're unavailable primarily by claiming that privilege. That's the vast majority of these cases. And yet in case after case, courts have found other corroborating circumstances. The defense likes to make out that it's impossible. You would never have any other corroborating circumstances. But there's case after case in which the statement itself provides those corroborating circumstances. For example, if we had a proffer saying, Gallego said the firearm was silver and black and that is what the firearm looked like, that could corroborate it. Yes, aunt, we left the backpack in the backyard of the Strandhome. That would tend to corroborate. There's a lot of things that could have been contained within the statement itself that would corroborate the actual knowledge of that gun in the backpack. But when you look at it, and there was a case relied on in the Lozado case that concerned controlled substances. And in that case, somebody else wanted to come in and say there was a declarant who said those are my drugs. And they wanted that admitted. And in that case, they said, well, just because somebody says they own a controlled substance doesn't mean somebody else can't be in possession of it. And I think that's the same circumstance that we have here. When Mr. Manning is giving, I think, his second and third statements to the police, he starts talking about how I loaned out this backpack to my son to fix a car. That was the consistent part of the statement. After he left, then I thought, oh, there's a used needle in that car. In the backpack, I better get it back. That doesn't make any sense. He said he'd been using drugs with his son. That wasn't unusual. Why would he care if this bag of tools has used syringe in it if they're just going to fix the motorcycle? So he started calling saying, you need to bring that back. And the time changes because the first time frame wasn't realistic and didn't make sense. So that later changes. You need to bring that back. Oh, we've already ditched that at a house on this street. Well, just that part of the story doesn't make any sense. Why are they ditching a backpack that supposedly they would know has a gun in it in a backyard for no reason? There were no other reports made that morning of suspicious activity in the neighborhood. There's no indication anybody was after anybody in the neighborhood at that time. So that doesn't make any sense. And he can't explain why he's so worried about the syringe being associated with the backpack and his claim that he didn't know anything bad was happening with the backpack. None of that makes any sense either. What makes sense is that either he knew what was in the backpack all along, the firearm, and maybe he didn't have the backpack all morning. Maybe his son had it. Maybe his son did call and say, we left that backpack in the backyard. But the truth of the matter is it was only really important to get that backpack because it had the gun in it. And after he had the backpack, it was only really important to get rid of and try to hide the backpack because there was a gun in it. And that's the evidence that the court had in front of it. So this list that appellate counsel has provided of corroborating circumstances was not put forth to the court at the time as corroborating circumstances. And I think when you look at them, they don't meet the clearly trustworthy standard. As I said, the 63 conversations, we have no idea how many of those were about a firearm. There was nothing in those conversations themselves to indicate that the substance of those was trustworthy. There's no other information that indicated he knew about that home burglary, the other home burglary, or the other contents of the backpack, variety of facts. She pointed out that Officer Detective Stedelli was looking for Gallego with some possible connection to that other burglary. Did the district court err in considering the sibling relationship between Manning and his sister Dietz in assessing the corroborating circumstances? I don't believe that the court did consider that relationship. And I think when you look at the context, it's clear that the government was arguing about the relationship between the declarant and the defendant. It's confusing. I think it's possible that the court did. If it did consider that relationship, wouldn't that really go to credibility, to Dietz's credibility? Between the witness and the defendant? Yes, I think it would. So that would have been error. Is your argument that it wasn't plain error? I think my argument is, Your Honor, that's not what the court relied upon. Okay. I mean, in her ruling, she specifically talks about corroborating circumstances, and she does not mention the witness's credibility. I thought the court relied on, as a factor against the defendant here in terms of corroboration, the sibling relationship between Manning and Dietz. And I guess it isn't a clear ruling. I will admit that. But I don't think that wasn't what the arguments to the court were about or the case law that was presented. So I don't – and in her ruling, she relates it to corroborating circumstances. So I don't believe she was weighing in on the credibility of the witness regarding her relationship to the defendant. We hadn't really discussed that relationship during that. And it's possible. Judges sometimes make a ruling on their own ideas rather than what's presented to them. But I think she had listened carefully to the arguments that were presented and was making her ruling based on those arguments. And while it was kind of a brief touching upon at the trial court, the defendant did argue that the relationship between the declarant and the witness – the titles get confusing – they did argue that as a corroborating factor. And so I think when the ruling talks about corroborating evidence, they're talking about those arguments that the parties put forth regarding corroborating evidence. And really, the defense offered the court very little other than the declarant's assertion of his Fifth Amendment rights and the fact that the witness was the declarant's aunt. They offered virtually nothing else in corroboration. And the court specifically asked at one point, what are you saying you have that is corroborating that makes the statement clearly trustworthy? And at one point, the defense said, well, we think the jury should decide that, and that's clearly not the appropriate function. The court does have a gatekeeping function. And gave the court very little to rely on in that category of corroborating circumstances. So the government would ask this court to affirm the lower court's ruling. Thank you. Any questions? Thank you, counsel. Thank you. The judge's ruling is quite clear. It relies on one factor that's wrong and one that's inadequate. And the government is asking the court to affirm on the basis of this ruling, and that's what this ruling consists of. I also want to address the point that the government made about the wildly inconsistent nature of defendants' stories. It is true, particularly the first story, he had ingested an enormous amount of methamphetamine, which I think the court can take judicial notice, may have affected the coherence of his statements. But throughout all of them, including that one, he said he didn't know the gun was there. And he also said he did know the drugs were there. It's not as though his statements were purely self-serving. He admitted over and over and over again, I was high as a kite and I knew there were drugs in the bag and that that could be a problem for me, and that a person would say, Mr. Manning's criminal history might think it's a problem that there are drugs out there with his DNA on it, is not out of the question. What this court is being asked to decide is whether this evidence should have gone to the jury, or whether the district court, based on reasoning that combined the inadequate with the impermissible, could take it from the jury's consideration at that point. We think the answer is no. Juries exist to resolve issues of credibility, and they should have been allowed to resolve this one. I see my time has expired. Perfect timing. Thank you, counsel. Thank you, counsel. Case is submitted. Counsel are excused.